# Illinois Official Reports

## Appellate Court

---

### *In re A.S.*, 2016 IL App (1st) 161259

---

| | |
|---|---|
| Appellate Court Caption | *In re* A.S., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. A.S., a Minor, Respondent-Appellant). |
| District & No. | First District, Second Division<br>Docket No. 1-16-1259 |
| Filed | October 7, 2016 |
| Decision Under Review | Appeal from the circuit court of Cook County, No. 15-JD-901; the Hon. Steven James Bernstein, Judge, presiding. |
| Judgment | Reversed and remanded with directions. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Rebecca Cohen, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg and Iris G. Ferosie, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE MASON delivered the judgment of the court, with opinion.<br>Justices Neville and Pierce concurred in the judgment and opinion. |

**OPINION**

¶ 1    After a jury trial,[1] minor respondent A.S. was adjudicated delinquent of the offense of residential burglary and sentenced to the Juvenile Department of Corrections. Respondent seeks a new trial based on his claim that the State used peremptory challenges to strike prospective black jurors without providing a race-neutral explanation as required under *Batson v. Kentucky*, 476 U.S. 79 (1986), and that the trial court did not fulfill its duty to closely evaluate the State's proffered reasons for striking these panel members. Alternatively, respondent contends that the State's failure to provide any reason for its peremptory challenge to one black member of the venire and the trial court's failure to inquire into the reason for the challenge as well as other irregularities in the proceedings require remand for a new *Batson* hearing. We agree with respondent's alternative argument and reverse and remand for further *Batson* proceedings.

¶ 2                                                    BACKGROUND

¶ 3    We confine our discussion of the facts to a summary of the jury selection process prior to respondent's trial. Jury selection spanned two days. On the first day, January 6, 2016, the State challenged for cause the first black member of the venire, Charles H. because he failed to disclose his criminal history, including charges for unlawful use of a weapon and attempted arson. The State also used challenges for cause against Bill B. and Kenneth J., two white males, for failing to disclose prior arrests during *voir dire*. Bill B. failed to reveal a DUI arrest and Kenneth J. did not disclose a battery charge from 1996.

¶ 4    Over the remainder of jury selection conducted that day, the State proceeded to use sequential peremptory challenges to strike three black members of the venire: Addie M., Madelyn B. and Connie T.

¶ 5    With respect to Connie T., a clerical worker for the Chicago Teachers Union, the State initially proposed to strike her for cause because she had not disclosed a theft conviction from 1977 for which she received supervision. It is unclear from the record whether this conviction was expunged. At the insistence of respondent's counsel, Connie T. was questioned in chambers. She at first did not remember the 39-year-old charge, but eventually recalled that in her teens she was in a store with her boyfriend who put an item in her purse without her knowledge and she was stopped on leaving the store. The State asked Connie T. no questions. Upon hearing Connie T.'s explanation, the court denied the State's challenge for cause and the State elected to use a peremptory challenge to dismiss her.

¶ 6    Respondent's counsel then raised a *Batson* challenge based on the State's conduct in striking Charles H. for cause and using peremptories to strike the three remaining black members of the venire. Counsel argued that these challenges had resulted in the dismissal of every prospective juror who was black.

¶ 7    After hearing argument, the trial court reiterated its belief that it had properly granted the State's motion to strike Charles H. for cause given his failure to disclose past arrests for serious crimes. The court further determined that respondent had not made a *prima facie*

---

[1] As the State chose to charge A.S. under the habitual juvenile offender provision of the Juvenile Court Act of 1987, he was entitled to a trial by jury. 705 ILCS 405/5-820(d) (West 2014).

showing that that State's use of three of its peremptories against Addie M., Madelyn B., and Connie T. was racially motivated. Referencing Connie T., the court commented that "I think there's been some consistency in [the State's] feeling with respect to failure to disclose" past criminal matters.

¶ 8    Requesting to make a record, the prosecutor noted that she had consistently stricken for cause jurors of any race who failed to disclose prior arrests during *voir dire* and that she had used a peremptory challenge against Holly B., a white woman, in addition to the three black women. Finally, the prosecutor noted that of the 40-person venire, "fewer than 10" and maybe only "five or six" were black.

¶ 9    When jury selection resumed the following day, respondent's counsel requested a mistrial, again based on the claimed *Batson* violation. Counsel noted that A.S. was black and the complaining witness was white. The State repeated the previous day's arguments and posited that, in any event, respondent's motion was premature given that jury selection had not concluded. The trial court adhered to its finding that respondent had not made out a *prima facie* case of a *Batson* violation, postponed ruling on respondent's motion for a mistrial, and resumed jury selection.

¶ 10   Joe W., a black man who indicated during questioning that he had a number of health problems and was not feeling well, was interviewed in chambers. Joe W. indicated that he had diabetes and high blood pressure and expressed doubt that he could make it through the trial. Ultimately, when asked if he thought he could serve if the court attended to any problems that arose by taking breaks or having juice available, Joe W. agreed that he could.

¶ 11   Joe W. had failed to disclose a DUI arrest from 2003. When questioned about the arrest by the trial court, he indicated that he forgot about it. Joe W. also indicated that he really didn't consider the DUI a "criminal" matter. Notwithstanding the previous day's assertion that it had challenged any prospective juror, regardless of race, who failed to disclose prior arrests, the State asked Joe W. no questions and accepted him as the 11th juror, as did respondent's counsel.

¶ 12   After the parties had selected 12 jurors, they proceeded to the selection of alternate jurors. The State used a peremptory challenge against Rita J., a black woman who had worked for 26 years as a therapist for the Department of Children and Family Services (DCFS). The State asked no questions of Rita J. during *voir dire* prior to using the peremptory. At that point, apparently based on the State's use of four of its five peremptories to dismiss black jurors, the court *sua sponte* found that respondent had made a *prima facie* case of a *Batson* violation ("now I'm saying that there is a pattern") and proceeded to question the State regarding the reasons for striking black members of the venire.

¶ 13   Starting with Rita J., the State cited her work history and argued that a DCFS social worker "may have some tendency to be lenie[nt] against [*sic*] the minor respondent." Respondent's counsel, who did not have his jury selection notes with him in chambers, pointed out that other members of the venire were in social service professions and he "guessed" that the State had accepted one or more of them. Based on the State's explanation, the court found the State's reason for exercising a peremptory against Rita J. was based on factors other than her race.

¶ 14   The parties next addressed the dismissal of Addie M. During voir dire questioning, Addie M. had disclosed that 12 years earlier her home had been surrounded on one occasion by police who were there to arrest her son on a robbery warrant. Addie M.'s son was later

- 3 -

convicted and served prison time. The prosecutor stated that, as a result of that incident, the State believed Addie M. "might have some feelings about the police that would be adverse to [the] prosecution." Respondent's counsel pointed out that another juror, Shelly L., a white woman, also had a son involved in a criminal matter where police came to her home looking for him, an argument ensued, and she later determined he was involved. The prosecutor asserted that the circumstances described by Addie M. were materially different as there was no indication that police had surrounded Shelly L.'s home or that her son had been convicted or served time on any criminal charge. Based on this explanation, the trial court concluded that the State had offered a race-neutral reason for Addie M.'s dismissal.

¶ 15    With respect to Madelyn B., she revealed on *voir dire* that she worked for Breakthrough Urban Ministries, an organization that serves a homeless population on the west side of Chicago. In articulating the reason for dismissing her, the State indicated, "the fact that she's a social worker from East Garfield Park would have been reason enough for us to think that" she would be adverse to the prosecution. Madelyn B. had further revealed during *voir dire* that she had been convicted of attempted robbery in the early 1960s and criminal trespass in the 1970s, although the State was not in possession of a criminal history indicating that she had any criminal convictions. Madelyn B. also used the phrase "substance abuse" in referencing her trespass conviction, but she did not elaborate.

¶ 16    During the in-chambers discussion regarding Madelyn B., respondent's counsel questioned the State's consistency in striking potential jurors with criminal backgrounds, citing the State's acceptance of Matthew H., a white juror who had been convicted of inciting a riot at Michigan State University. The conviction was later expunged. The State characterized the comparison as "laughable," and without further explanation from the State, the court engaged in its own comparison of Madelyn B. and Matthew H.:

> "THE COURT: Time out. Something happened at Michigan State where he was arrested for mob action. Again you're talking about questions of degree. ***
>
> * * *
>
> I see a substantial difference. I mean I would want a recovering alcoholic, a recovering drug person on the jury if I was a defense lawyer, but as a State I can understand it. They are all questions of degree.
>
> MR. BARRIDO [respondent's counsel]: Judge, with all due respect are you saying—
>
> THE COURT: Am I saying that there is a distinction between somebody who is guilty of mob action in a riot when back in the day those things were happening.
>
> MR. BARRIDO: And back in the day the African American lady was also presumably very young when these things occurred.
>
> THE COURT: It's a different situation.
>
> MR. BARRIDO: May I have her age for the record Judge.
>
> THE COURT: I don't have it with me.
>
> MR. PONCE DE LEON: Judge I believe that same potential juror said it was the 60's or 70's.
>
> THE COURT: Oh, yeah she said she was blasted. *All I'm trying to establish here is that there is some rational basis for the State of Illinois not to want this person.*
>
> * * *

- 4 -

I do draw a distinction between the degrees of the crimes." (Emphasis added.)

The court did not make an explicit finding that the State's proffered reason for striking Madelyn B. was race-neutral. The record further does not disclose how old Matthew H. was at the time of jury selection or when he was convicted, although during questioning, he indicated that he had children aged 4 and 11 months.

¶ 17    The State did not offer and the court did not ask for any race-neutral explanation for exercising a peremptory challenge against Connie T. The only basis for the State's for-cause challenge was Connie T.'s failure to disclose her 39-year-old theft conviction, which the court rejected. As noted, the court had earlier commented on the State's apparent consistency in dismissing members of the venire who had failed to disclose past arrests, but that was before the court determined that respondent had established a *prima facie* case and before the State had accepted Joe W., who had also failed to disclose a prior DUI.

¶ 18    During the discussion of Madelyn B., the court indicated that it had not reviewed *Batson* recently and, after the parties completed jury selection, recessed to review it. When court reconvened and prior to the arrival of respondent's counsel, who had gone to get a copy of the decision for the court, the court ruled that the State had not exercised peremptory challenges against black jurors for racially motivated reasons, commenting:

> "THE COURT: It is a real low bar. *** And now I'm going along with a dissent in the [*Batson*] case. But I've always believed that the *** lawyers trying the case have the right to do the best for their client be it the State or the [d]efense. And absen[t] some absolutely no showing that there is a reason other than racial discrimination to exclude a particular witness [*sic*] from a case, I think that's what peremptory challenges are and should be about.
>
> I think people unfortunately have the right to look at somebody and say I don't like the way that guy is looking at me."

The court then denied respondent's motion for a mistrial.

¶ 19    When counsel for respondent arrived after the court's oral ruling, apologizing that it took him longer to get the decision than he anticipated, the court stated "I think there are reasons other than race for the State to have excluded those people that they excluded." Jury selection was completed and the matter then proceeded to trial.

¶ 20                                                    ANALYSIS

¶ 21    In *Batson*, the United States Supreme Court determined that the prosecution's use of peremptory challenges to exclude prospective jurors on the basis of race violated a defendant's right to equal protection under the fourteenth amendment. 476 U.S. at 89. "Although a prosecutor ordinarily is entitled to exercise permitted peremptory challenges 'for any reason at all, as long as that reason is related to his view concerning the outcome' of the case to be tried[ ] [citations], the [e]qual [p]rotection [c]lause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." *Id.*

¶ 22    *Batson*'s three-step process for addressing alleged discriminatory use of peremptory challenges is well-settled. First, it is the defendant's burden to make a *prima facie* showing that the prosecutor has exercised peremptory challenges on the basis of race. *Id.* at 96; see

also *People v. Davis*, 231 Ill. 2d 349, 360 (2008). Our supreme court has articulated a number of factors trial courts should consider in this context, which we discuss in more detail below. See, *e.g.*, *People v. Rivera*, 221 Ill. 2d 481, 501 (2006) (enumerating nonexclusive list of factors).

¶ 23    Second, once a defendant makes out a *prima facie* case, the burden shifts to the prosecution to articulate a race-neutral reason for excluding each dismissed juror, which "need not rise to the level justifying exercise of a challenge for cause." *Batson*, 476 U.S. at 97. Also at the second stage, defendant is afforded the opportunity to argue that the State's proffered reasons for striking particular members of the venire are pretextual. *Davis*, 231 Ill. 2d at 363; *People v. Easley*, 192 Ill. 2d 307, 324 (2000).

¶ 24    At the third stage, the trial court makes the ultimate determination of whether the party opposing the challenge has made the required showing of purposeful discrimination. At this stage, it is the trial court's responsibility to undertake " 'a sincere and reasoned attempt to evaluate the prosecutor's explanations in light of the circumstances of the case.' " *People v. Harris*, 129 Ill. 2d 123, 174-75 (1989) (quoting *State v. Hall*, 672 P.2d 854, 858 (Cal. 1983)). In addition to considering the stated reasons offered by the prosecutor, the court evaluates the prosecutor's demeanor, which reviewing courts have recognized entails credibility determinations. *Hernandez v. New York*, 500 U.S. 352, 365 (1991) ("the best evidence [bearing on the ultimate question of discrimination] often will be the demeanor of the attorney who exercises the challenge"); *Rivera*, 221 Ill. 2d at 502 ("[A] trial court's third stage finding on the ultimate issue of discrimination rests largely on credibility determinations. *McDonnell v. McPartlin*, 192 Ill. 2d 505, 527 (2000)." (Emphasis omitted.)). For this reason, a trial court's third-stage findings regarding purposeful discrimination are afforded deference and will not be reversed unless they are clearly erroneous. *Hernandez*, 500 U.S. at 365; *People v. Hogan*, 389 Ill. App. 3d 91, 100 (2009). Finally, " 'the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.' " *Rice v. Collins*, 546 U.S. 333, 338 (2006) (quoting *Purkett v. Elem*, 514 U.S. 765, 768 (1995) (*per curiam*)); see also *Davis*, 231 Ill. 2d at 363.

¶ 25    Here, although respondent raised a *Batson* challenge on the first day of jury selection and renewed it the following day before jury selection resumed, the trial court *sua sponte* determined that a *prima facie* case was established once the State used a peremptory to dismiss Rita J. as an alternate juror. The record does not reflect that the court relied on anything other than the number of peremptories used by the State against prospective black jurors, a factor that, while relevant, is not, standing alone, sufficient to make out a *prima facie Batson* violation. See *People v. Garrett*, 139 Ill. 2d 189, 203 (1990) (number of black members of venire peremptorily challenged, without more, not sufficient to establish *prima facie* case of discrimination); see also *Rivera*, 221 Ill. 2d at 514 (pattern of discrimination not demonstrated "anytime a party strikes more than one juror of any race"); *People v. Shaw*, 2014 IL App (4th) 121157, ¶ 25 ("[W]hile evidence of a pattern of discriminatory strikes is one factor a court should consider when determining whether the party challenging the peremptory strike has established a *prima facie* case under *Batson*, it is not a dispositive factor."). Indeed, discrimination may be found even in the absence of a pattern of peremptory challenges. *People v. Davis*, 345 Ill. App. 3d 901, 910 (2004) ("If the absence of a 'pattern of strikes' were enough, in and of itself, to defeat the establishment of a *prima facie* case of discrimination under *Batson*, this would effectively enable a prosecutor to

exercise at least one peremptory challenge in a discriminatory manner. Such a possibility is untenable in light of the fact that pursuant to *Batson* and its progeny, the exclusion of just one venireperson on account of race is unconstitutional and requires reversal of the conviction."). We cannot discern what led the court to conclude that three peremptories in a row against black members of the venire did not a *prima facie* case make, while another peremptory exercised the following day against Rita J. did. See *Rivera*, 221 Ill. 2d at 505 ("[W]hen a trial court chooses to act *sua sponte*, it must make an adequate record, consisting of all relevant facts, factual findings, and articulated legal bases for *** its finding of a *prima* facie case ***.").

¶ 26    In a colloquy on the first day of jury selection after respondent's counsel first raised his *Batson* challenge, the court commented that it did not find a "systematic" exercise of peremptories against black members of the venire "because there has been some consistency in the [State's] feeling with respect to failure to disclose" prior criminal matters. But that rationale—not yet articulated by the State because the court declined to make a finding of a *prima facie Batson* violation—did not apply either to Addie M. or Madelyn B. Addie M. had no criminal background, disclosed or undisclosed, and Madelyn B. disclosed her decades-old criminal background, of which the State apparently had no record.

¶ 27    Although courts are entitled to raise *Batson* claims *sua sponte* (*id.* at 504), because respondent here had already raised such a challenge, it would have been preferable for the court to wait for respondent to renew his *Batson* claim after the State used a peremptory against Rita J. Given respondent's persistence in pursuing his *Batson* claim, there was virtually no chance that the State's use of another peremptory against a black member of the venire would have gone unchallenged. The court could then have conducted a first-stage hearing and articulated the bases for its finding that respondent had sustained his initial burden. We recognize that this process interrupts jury selection, but it is the process that *Batson* requires.

¶ 28    The issue of the existence of a *prima facie* case is generally moot once a trial court finds no discriminatory motive in striking black members of the venire. *Hernandez*, 500 U.S. at 359; *Rivera*, 221 Ill. 2d at 506 ("[W]hether a *prima facie* case of discrimination exists at the outset becomes a moot point after the trial court finds valid and race-neutral reasons supporting the peremptory challenge ***."). But here, because we find that the trial court did not properly conduct the second- and third-stage *Batson* hearing and, therefore, remand is necessary, we examine the record to determine whether it is sufficient to find that respondent sustained his initial burden to establish a *prima facie* case so that a new first-stage hearing is not necessary.

¶ 29    *Rivera* articulated the following relevant factors a trial court should consider in determining whether a *prima facie Batson* violation has been established:

> " '(1) the racial identity between [the party exercising the peremptory challenge] and the excluded venirepersons; (2) a pattern of strikes against African-American venirepersons; (3) disproportionate use of peremptory challenges against African-American venirepersons; (4) the level of African-American representation in the venire as compared to the jury; (5) the prosecutor's questions and statements [of the challenging party] during *voir dire* examination and while exercising peremptory challenges; (6) whether the excluded African-American venirepersons were a heterogeneous group sharing race as their only common characteristic; and (7) the

race of the defendant, victim, and witnesses.' " *Id.* at 501 (quoting *People v. Williams*, 173 Ill. 2d 48, 71 (1996)).

Further, "when a *Batson* claim is made regarding discrimination against a particular race, the unchallenged presence of jurors of that race on the seated jury is a factor properly considered [citations] and tends to weaken the basis for a *prima facie* case of discrimination." *Id.* at 513.

¶ 30    We believe the record is sufficient for us to conclude that respondent sustained his burden to demonstrate a *prima facie Batson* violation. As to the first factor, when respondent renewed his *Batson* claim on the second day of jury selection, one of the prosecutors stated, "[F]irst of all with respect to the erroneous assumption that we would strike African American jurors because we think that they would curry *** favor with a black defendant, hello there's a black prosecutor on the team too." From this comment, we may infer that at least one member of the prosecution team is black. So, for purposes of argument, we will assume *Rivera*'s first factor weighs against a finding of a *prima facie* case. But the remaining factors weigh in favor of such a finding.

¶ 31    There was clearly a pattern of strikes by the prosecution against black members of the venire. Leaving aside Charles H., who was properly dismissed for cause, the State exercised three peremptories in a row against prospective black jurors on the first day of jury selection, resulting in the dismissal of every black member of the venire questioned thus far. At that point in jury selection, the State had used three of four or 75% of its peremptories against black venirepersons. Using the State's estimate of "5 or 6" or "maybe 10" blacks in the 40-person venire, blacks comprised anywhere from 12.25% (5 out of 40) to 25% (10 out of 40) of the venire, yet not a single black had been chosen for respondent's jury. Aside from asking members of the venire whether they knew people in law enforcement or the military, the State asked very few questions of any member of the venire, even when they were questioned in chambers. As to the challenged members of the venire, Connie T. was a clerical employee who failed to disclose a 39-year-old retail theft conviction; Addie M. ran a day care business out of her home and had no criminal history, but her son had a criminal case; and Madelyn B. worked with the homeless and disclosed her decades-old criminal history. It would appear, at least for purposes of a *prima facie* case, that these three members of the venire were a heterogeneous group sharing race as their only common characteristic. Respondent is black and the victim of the residential burglary is white. The record does not disclose the race of other witnesses other than respondent and the victim, both of whom testified.

¶ 32    Under these circumstances, we believe the trial court could properly have found that respondent established a *prima facie* case on the first day of jury selection. The resumed proceedings on the next day reinforce this conclusion. Although the State ultimately accepted Joe W., a black man, as a member of the jury, it did so under the shadow of a *Batson* challenge. As we discuss below, the State's agreement to Joe W. may have been driven by factors that render his selection suspect. And although empaneling a black juror improves the numbers somewhat, they are still lopsided. Once 12 jurors were selected, with one black member, 8.3% of the jury was black. This is still below the percentage of black venirepersons, even at the low end of the State's estimate.

¶ 33    But once the prosecution used another peremptory against Rita J.—rendering black members of the venire subject to 80% (4 out of 5) of the State's peremptory challenges—respondent's satisfaction of his initial burden, given the other factors discussed

above, was beyond argument. Rita J., a retired DCFS worker with no criminal history, shares no obvious commonalities with the other excluded members of the venire, and although a black man was ultimately selected as one of the alternates, as respondent points out, the State at that point had no other peremptories left. We therefore agree with the trial court that respondent established a *prima facie Batson* violation.

¶ 34    Once the court concluded respondent had established a *prima facie* case, it required the State to proffer reasons for striking black members of the venire, starting with the most recent peremptory exercised against Rita J. After the State articulated its belief that a DCFS social worker might be sympathetic to respondent, respondent's counsel contended that the court, during its questioning of Rita J., had described her work with youth as "god's work." In its questioning of members of the venire, the court had also used this phrase to describe the social service-related professions of other members of the venire and counsel "guessed," because he did not have his notes in chambers, that the State had accepted some of those jurors. As it turns out, the State had accepted Shelly L., a white member of the venire who was a nurse employed as the executive director of a long-term care facility for disabled children and young adults, which the trial court likewise described as "god's work." (Shelly L. was later excused for health reasons.) Without evaluating whether the assertion by respondent's counsel was correct, the court accepted the State's justification for striking Rita J. as race-neutral.

¶ 35    A prospective juror's experience in social work has been recognized as a legitimate, race-neutral explanation for exercising a peremptory challenge by the prosecution. See *People v. Mack*, 128 Ill. 2d 231, 241 (1989) (excusing jurors based on their employment was "legitimate and race neutral"); *People v. Taylor*, 409 Ill. App. 3d 881, 902 (2011) ("Employment in the social work field has been held to be a race-neutral reason for a peremptory challenge."); *People v. Hemphill*, 230 Ill. App. 3d 453, 467 (1992). But the record does not disclose that once the State articulated this as a basis for dismissing Rita J., the trial court conducted a third-stage hearing to evaluate the State's proffered reason in the context of the entire jury selection process, including whether Rita J.'s work was comparable to Shelly L.'s position. Without analysis, the trial court simply accepted the State's reason for striking Rita J. as race neutral, stating, "I agree with you on this one."

¶ 36    With respect to Addie M., the State's articulated reason for dismissing her related to her experience when police surrounded her home in order to arrest her son. Although respondent argued that Shelly L., who had been accepted by the State, had a similar experience with her son, the State argued that the circumstances as described by both individuals were quite different. But the State asked no questions of either individual regarding their experiences and the court did not further evaluate the circumstances before declaring the State's reason race-neutral. In effect, the court terminated the *Batson* process with respect to Rita J. and Madelyn B. at stage two. If the State's stated reason for exercising peremptories against these two members of the venire was not at least facially race-neutral, the hearing would not have proceeded to stage three. But the court apparently concluded that the State sustained its stage two burden of production and so at that point, the court should have proceeded to evaluate the State's proffered reasons considering all relevant factors. The court's conclusory declaration that it "agreed with" the State's reasons does not constitute "a sincere and reasoned attempt to evaluate the prosecutor's explanations in light of the circumstances of the case." (Internal quotation marks omitted.) *Harris*, 129 Ill. 2d at 175-76.

¶ 37     Other irregularities in the remainder of the *Batson* hearing also require remand. First, with respect to Madelyn B., the State initially noted the nature of her employment and stated: "the fact that she was a social worker from East Garfield Park would have been reason enough for us to think that she may have a position that is adverse to our position, but that coupled with the fact that she had extensive history with the criminal justice system where she was a defendant, we used a peremptory." When respondent's counsel then drew a comparison between Madelyn B. and Matthew H., a white juror convicted of inciting a riot who the State had accepted, the court took over the prosecutor's role, engaging in the extended colloquy quoted above in which it compared the two individuals and the nature of their prior convictions. The court also embellished the facts with respect to both individuals, characterizing Matthew H.'s conviction as occurring "back in the day" when "those things were happening," and referring to Madelyn B. as a "recovering alcoholic" or "recovering drug person" who "was blasted" when she was arrested for criminal trespass in the 1970s. None of these facts appear of record, but more importantly, it was not the court's function to defend the State's exercise of a peremptory challenge against Madelyn B.

¶ 38     In *People v. Crockett*, 314 Ill. App. 3d 389 (2000), after the defendant raised a *Batson* challenge, the trial court, in discussing one of the excluded members of the venire, stated that she was dismissed because of arthritis that prevented her from sitting for long periods of time. Without eliciting any race-neutral reason from the State for its exercise of a peremptory, the court found no discrimination. Remanding for further *Batson* proceedings, this court noted that "reasons articulated by the [c]ourt cannot satisfy the State's step two burden of production." *Id.* at 397. Noting that it is the State's burden at the second stage to articulate its reasons for exercising peremptory challenges, the court stated: "To allow the court to rely on its own reasons without eliciting any explanations by the State would effectively omit step two of the *Batson* process, and collapse it into step three." *Id.*

¶ 39     Here, although the State initially responded that the comparison between Matthew H. and Madelyn B. was "laughable," the trial court did not wait for the State to articulate its position further and instead proceeded to debate respondent's counsel regarding what the court saw as differences in "degree" between the two. Particularly since the State did not question either Matthew H. or Madelyn B. about the circumstances of their prior criminal matters, the record does not disclose how the trial court came to its own conclusion that Matthew H.'s conviction for inciting a riot at a university was so much less significant than Madelyn B.'s attempted robbery and criminal trespass convictions from the 1960s and 1970s. But it was not for the court to draw this distinction during the second-stage proceeding nor was it appropriate for the court itself to establish "some rational basis for the State of Illinois not to want this person." And the court never made the ultimate finding that the State's articulated reason for dismissing Madelyn B. was race-neutral. Because the record in this case reveals that the trial court usurped the State's role at stage two and failed to conduct a stage three *Batson* hearing with respect to Madelyn B., this additional error requires remand for further proceedings.

¶ 40     Finally, as noted, the trial court failed to require the State to state a race-neutral reason for the peremptory exercised against Connie T. Once there has been a finding of a *prima facie* case under *Batson*, the State is required to articulate a race-neutral reason for all black members of the venire who were challenged by the State. *People v. Wiley*, 156 Ill. 2d 464, 476-77 (1993); *Crockett*, 314 Ill. App. 3d at 396-97. The trial court's failure to elicit any

race-neutral reason from the State for the exercise of a peremptory against Connie T. requires remand. *Crockett*, 314 Ill. App. 3d at 398.

¶ 41    Although the State argues on appeal that its for cause challenge to Connie T. on the basis of her undisclosed retail theft case should suffice, the court found no cause to dismiss Connie T., and we cannot imply a race-neutral reason for the exercise of this peremptory. *Id.* at 409 (even if State's race-neutral reason could be anticipated by court of review, court refused to establish precedent for elimination of State's stage-two burden of production). Because further proceedings are required on remand, we point out that the State's position on this issue may be problematic given its decision to accept Joe W. with the knowledge that he had failed to disclose a DUI case. Once the State varied from its position that, regardless of race, any member of the venire who failed to disclose a past criminal arrest would be dismissed, its continued reliance on this reason becomes open to question. If, as the State maintained on the first day of jury selection, the *sine qua non* of an unacceptable juror was a failure to disclose, it is hard to rationalize why the State accepted Joe W. At that point in jury selection the State still had three unused peremptories and could easily have dismissed him. On the other hand, the prosecution must have realized that the court would be hard-pressed not to entertain a *Batson* challenge after the State's fourth peremptory against a black member of the venire and may have calculated that Williams, with his health problems, was unlikely to be a holdout juror and would in all likelihood go along with whatever his fellow jurors decided to do. In addition, a comparison between Connie T. and Matthew H. does not necessarily appear "laughable." It is these types of considerations that should inform a trial court's third-stage evaluation of reasons proffered by the State for dismissing minority members of the venire.

¶ 42    While respondent's counsel could have brought the State's failure to articulate a race-neutral reason for exercising a peremptory against Connie T. to the trial court's attention, the State has not argued waiver on appeal. See *People v. Jones*, 374 Ill. App. 3d 566, 578 (2007) (finding that because defendant did not pursue a *Batson* objection to the State's use of a peremptory against a black member of the venire by insisting that the State articulate a race-neutral justification, he could not pursue that objection on appeal). Further, we do not believe finding waiver of this error would be appropriate under the circumstances here where we have found multiple errors in the *Batson* proceedings and the trial court made its ultimate finding of nondiscrimination in the absence of respondent's counsel.

¶ 43    We must also address the incorrect standards the trial court employed in making its ultimate, albeit incomplete, ruling that the State's exercise of peremptories against black members of the venire was not discriminatory. In the course of his oral ruling, the trial judge stated that he was "going along with a dissent in the [*Batson*] case" and that, in exercising peremptories, lawyers "have the right to look at somebody and say I don't like the way that guy is looking at me." These are clear errors of law. See *Wiley*, 156 Ill. 2d at 474-75 (court's concern that trial court applied outdated legal standard during *Batson* hearing warranted remand: "[T]he remarks made by the trial court were improper and misguided. Their occurrence is an integral part of our decision to remand the matter for further *Batson* proceedings.").

¶ 44    Whatever idea the trial judge meant to convey by his first comment, he was not at liberty to follow the reasoning of a dissent in a controlling United States Supreme Court case. And while prosecuting attorneys may offer any race-neutral reason for exercising a peremptory, including the way a member of the venire looks and acts, such subjective observations should

be subject to close scrutiny. *People v. Williams*, 209 Ill. 2d 227, 245 (2004) (subjective assessments of a venireperson's demeanor should be given close scrutiny because such perceptions may be easily used as a pretext for discrimination (citing *People v. Wiley*, 165 Ill. 2d 259, 274-75 (1995))); *Easley*, 192 Ill. 2d at 327.

¶ 45    But no matter what reason is offered by the prosecution for the exercise of a peremptory, it is the trial court's responsibility at the third stage to evaluate that reason in light of the nature of the case, the exercising attorney's demeanor, and the jury selection process as a whole. Because the stage-two and stage-three *Batson* hearing in this case may have been influenced by the trial court's demonstrably incorrect view of the law and in light of the other errors discussed above, we remand for further proceedings.

¶ 46                                  CONCLUSION

¶ 47    Respondent has requested that we reverse and remand for a new trial. That result would be appropriate if any member of the venire was dismissed based on race. *Davis*, 231 Ill. 2d at 360; *Snyder v. Louisiana*, 552 U.S. 472, 478 (2008) (" '[T]he Constitution forbids striking even a single prospective juror for a discriminatory purpose.' " (quoting *United States v. Vasquez-Lopez*, 22 F.3d 900, 902 (9th Cir. 1994))); *Mack v. Anderson*, 371 Ill. App. 3d 36, 55 (2006). But because the trial court did not conduct the required stage-two and stage-three *Batson* hearing, we will not make that initial determination on appeal. Therefore, we grant respondent's alternative request for relief and remand this matter to the trial court for a *Batson* hearing to be conducted within 60 days of the date of this order and consistent with the directions contained herein. We retain jurisdiction to resolve any further issues following completion of the hearing on remand.

¶ 48    Reversed and remanded with directions.