# Illinois Official Reports

## Appellate Court

> ## *In re A.S.*, 2017 IL App (1st) 161259-B

| | |
|---|---|
| Appellate Court Caption | *In re* A.S., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. A.S., a Minor, Respondent-Appellant). |
| District & No. | First District, Second Division<br>Docket No. 1-16-1259 |
| Filed<br>Rehearing denied | March 31, 2017<br>May 5, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County No. 15-JD-901; the Hon. Steven James Bernstein, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Rebecca Cohen, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg and Iris G. Ferosie, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE MASON delivered the judgment of the court, with opinion.<br>Justice Pierce concurred in the judgment and opinion.<br>Justice Neville specially concurred, with opinion. |

¶ 1       This matter is before us following remand to the circuit court of Cook County to conduct a further hearing pursuant to *Batson v. Kentucky*, 476 U.S. 79 (1986), to address respondent's claim that the State improperly used peremptory challenges to strike prospective black jurors during jury selection in his delinquency proceedings. In our earlier opinion in this case, we found that the trial court had improperly collapsed the second and third stages of the *Batson* hearing and, further, had not elicited any race-neutral reason from the State for its use of a peremptory against one prospective black juror, and therefore, we remanded for a resumed hearing. *In re A.S.*, 2016 IL App (1st) 161259, ¶¶ 40, 47. We retained jurisdiction to further consider respondent's *Batson* challenge, if necessary.

¶ 2       Following the hearing on remand, the trial court concluded that the State had proffered race-neutral reasons for exercising peremptory challenges against all four black members of the venire. Because we conclude that respondent sustained his burden to show, as to one juror, that the State's proffered race-neutral reason was pretextual, we reverse and remand for a new trial.

¶ 3                             BACKGROUND

¶ 4       On March 23, 2015, A.S., then a 17-year-old African American, was charged with the March 20, 2015, residential burglary of a home belonging to a white woman. Following a jury trial,[1] A.S. was adjudicated delinquent of that offense and on May 11, 2016, was committed to the Department of Juvenile Justice until his twenty-first birthday.

¶ 5       Our prior opinion discussed in detail the process of jury selection, and we will not repeat that discussion. As relevant to the issue here, both on the juror questionnaire and during the court's questioning of prospective jurors, members of the venire were asked whether they had "ever been accused of, a complainant or a witness in a criminal case?" As questioning of the panels was complete, the court and counsel would recess to chambers, and the State, in raising challenges for cause, would indicate that certain individuals had not disclosed criminal cases of which the State had a record. On the first day of jury selection, the State successfully challenged for cause Bill B., who had failed to disclose a driving under the influence (DUI) conviction. The State did not ask Bill B. any questions during *voir dire*.

¶ 6       Also on the first day of jury selection, the State disclosed that 56-year-old Connie T. had failed to disclose a prior criminal matter: a theft charge from 1977 for which she received supervision. The State proposed that she be stricken for cause. When the court wavered over the significance of a nearly 40-year-old theft case, the court asked the prosecutor whether she felt strongly enough about it to use a peremptory challenge. The prosecutor responded: "We have to be consistent so we have to ask." The court initially indicated that it would excuse Connie T. for cause but then agreed to have her questioned in chambers, and the following colloquy occurred:

---

[1]As we noted in our original opinion, A.S. was entitled to a jury trial due to the State's decision to charge him under the habitual juvenile offender provision of the Juvenile Court Act of 1987. 705 ILCS 405/5-820(d) (West 2014).

> "THE COURT: On your response, you mentioned to us that you had never been accused of a criminal case.
>
> [CONNIE T.]: Not that I know of.
>
> THE COURT: All right. Do you recall back in 1977 a—was it retail theft?
>
> MR. MUNIZ [Assistant State's Attorney]: Theft.
>
> THE COURT: You got a supervision is what they're saying. What's your birth date?
>
> [CONNIE T.]: 1-22-59.
>
> MR. MUNIZ: Yes, [J]udge. Per the information that we ran, we have *** a Connie [T.] with a birth date of January 22, 1959.
>
> [CONNIE T.]: Yes.
>
> MR. MUNIZ: We have a statute citation for theft.
>
> THE COURT: A statute citation?
>
> MR. MUNIZ: I mean the citation is for theft. Basically the statute that they're referencing is theft and [she] was sentenced to supervision back on January 6, 1978, out of Cook County.
>
> [CONNIE T.]: I remember now.
>
> THE COURT: You remember?
>
> [CONNIE T.]: Yes, sir.
>
> THE COURT: What was that?
>
> [CONNIE T.]: I was in Carson's, and my boyfriend was putting something in my purse and I didn't know, so when we walked out of the door in Evergreen Plaza they stopped me and not him."

When asked by defense counsel whether she intentionally omitted that information from her questionnaire, Connie T. responded, "Oh no, sir. I completely forgot about it." The State did not ask Connie T. any questions.

¶ 7    After she left, the State still proposed to excuse Connie T. for cause. When the court refused, the State did not press the issue by expressing its belief that Connie T. had lied about failing to remember the 1977 case. The State then used peremptories to strike both Connie T. and Madelyn B., another black member of the venire. At that point, the State had used three peremptories to strike black members of the venire, which prompted respondent's *Batson* challenge.

¶ 8    The court declined at that point to find that respondent had established a *prima facie* case. Without requesting the State to indicate why it had exercised peremptories against black members of the venire, the court observed that the State had demonstrated "some consistency" in requesting the dismissal for cause of any members of the venire who had failed to disclose prior criminal matters. With respect to Connie T., the court stated: "the State was consistent with their statement that they didn't want Connie [T.] on because she also quote 'lied,' if you want to use that term. *I found that she didn't* so they were forced to use a peremptory challenge." (Emphasis added.) The court drew a distinction between Connie T. and other members of the venire stricken for failure to disclose more serious matters, stating, "I didn't give [the State] challenge for cause because I think that could be an honest mistake 40 years ago, supervision. Theoretically, it's not a conviction. People don't

understand the distinction sometimes." The trial judge also noted that when he represented clients in criminal matters in which they received supervision, he used to tell them, "you were never convicted. You don't have to tell people."

¶ 9    The following day before jury selection resumed, counsel for respondent renewed his *Batson* challenge via a motion for a mistrial, but the court adhered to the previous day's ruling.

¶ 10    The next black member of the venire questioned was Joe W. After he was questioned by the court, Joe W. volunteered, "I'm beginning to feel bad now actually. I got medical conditions." He further revealed he was an insulin-dependent diabetic and had high blood pressure, cholesterol problems, and glaucoma. In chambers with counsel, the court raised the possibility of dismissing Joe W. for cause given his health issues, but counsel for respondent asked that he be brought in for questioning. At that point, the State revealed that Joe W. had a 13-year-old DUI conviction that he did not disclose on his juror questionnaire or during the court's questioning.

¶ 11    When Joe W. was questioned in chambers, he indicated that he had numerous health issues and was taking several different medications. The court inquired about his DUI conviction:

> "Q. *** Now there is a question for a prior arrest for DUI. Do you recall that?
>
> A. Yeah, 2003. I forgot about that. I was with the VA."

When Joe W. explained that he had been pulled over after drinking all night following his brother's funeral, the court asked: "So did you just forget about it when you did it?" Joe W. responded:

> "A. Your Honor, that's what I'm saying[.] [S]ometimes I am right there and then again I can't remember yesterday hardly."

In response to questions from defense counsel, Joe W. elaborated that when asked about criminal cases, he associated the question with criminal matters like "boom, boom" and "wasn't even thinking of the DUI as a criminal deal." Joe W. further indicated that he thought he could serve on the jury if the court accommodated his health issues by taking breaks as necessary. The State did not ask Joe W. any questions.

¶ 12    After Joe W. left chambers, the following colloquy occurred:

> "MS. DAWKINS [Assistant State's Attorney]: I'm assuming that you are not going to excuse him for cause.
>
> THE COURT: I'm convinced he can make it.
>
> MS. DAWKINS: So with respect to the arrest.
>
> THE COURT: No."

At that point, although it had exercised only four of its seven peremptory challenges, the State accepted Joe W.

¶ 13    Once 12 jurors had been empaneled, the parties commenced questioning of alternate jurors. When the State exercised a peremptory against the next black member of the venire, Rita J., the court *sua sponte* found that there was a *prima facie Batson* violation and proceeded to ask the State to articulate race-neutral reasons for its use of peremptories. The court's *sua sponte* finding was based solely on the number of black venire members challenged by the State, a factor that, standing alone, is generally insufficient to make out a

*prima facie* case. *People v. Rivera*, 221 Ill. 2d 481, 513-14 (2006); *People v. Garrett*, 139 Ill. 2d 189, 203 (1990). Nevertheless, in our earlier opinion, we examined the relevant factors and determined that the respondent, in fact, established a *prima facie* case and that the State was properly required to articulate race-neutral reasons for its use of peremptory challenges against black members of the venire. *In re A.S.*, 2016 IL App (1st) 161259, ¶ 33. The State then proffered explanations for its decision to use peremptories against three of the four black members of the venire but failed to articulate, and the court did not inquire about, a reason for the use of a peremptory challenge to strike Connie T.

¶ 14    Respondent's case proceeded to trial, and following his adjudication, he appealed. Among other issues, the court's failure to elicit a race-neutral reason for the State's exercise of a peremptory against Connie T. prompted remand. *Id.* ¶ 40.

¶ 15    During the hearing on remand, the parties again addressed the State's reasons for exercising peremptory challenges against black members of the venire. With respect to Connie T., notwithstanding the court's observation in denying the State's challenge for cause during the first hearing that her failure to remember the 1977 case was an "honest mistake," the State asserted that the prosecutors did not believe Connie T. when she claimed not to recall the case. In particular, according to the State, its use of a peremptory was based on its belief that Connie T. was not truthful about her recollection of the theft case. According to the State, Connie T. "repeatedly denied" the case and that it was only after she was "pressed" on the matter that she recalled the details. The State elaborated:

> "MS. DAWKINS: Based on her demeanor we determined that she was not being truthful. Theft is a crime of moral turpitude. [Connie T.] was in the back for some period of time. She was being questioned about something she already had been evasive about[;] we, the [S]tate, were asking her the questions in the back[.] [W]e were actually conducting the questioning when she was in the back with us. Confirming her age and name, confronting her with the fact that she did not disclose a crime."

¶ 16    In response, defense counsel pointed out that the court, and not the State, had questioned Connie T. in chambers, which is, in fact, borne out by the transcript quoted above. Further, counsel argued that the State's acceptance of Joe W. cast doubt on the legitimacy of its reliance on failure to disclose criminal matters as a race-neutral basis for dismissing prospective jurors. The State responded that the distinction between Joe W. and Connie T. was the State's assessment of their demeanor when questioned in chambers.

¶ 17    After the parties articulated their positions with respect to the reasons offered by the State for using its peremptories, the hearing adjourned for the court to consider its decision. On November 30, 2016, the court ruled orally on respondent's *Batson* challenge. The court prefaced its ruling by noting that, due to the scarcity of jury trials in juvenile court, it did not have any difficulty recalling the jury selection process in respondent's case despite the passage of 11 months. The court also observed that it was familiar with the lawyers for the parties and believed them to be "fair-minded and ethical."

¶ 18    The court noted generally that "[t]he State was very consistent in requesting strikes for all who answered the jury card questions in an untruthful way," and in particular as to Connie T., the court found that she "was stricken for race neutral reasons[,] specifically, the State felt that she was being evasive in her answers and not truthful with the Court." As to Joe W., the court found that "[t]he ASA indicated that in their opinion Joe W. was truthful and believable

and he was actually very likeable." The court acknowledged that the State's failure to exercise a peremptory against Joe W. was contrary to its position that failure to disclose criminal matters was grounds for dismissal but noted that the State "did believe he made a mistake." Comparing Joe W. and Connie T., the court stated: "[The State] did not believe her so there's a distinction that I'm making today between Joe W. and Connie T.; that one was believable; one was not believable." Ultimately, the court concluded that "[t]here was no individual exclusion of any of these African-Americans from the jury for anything other than a race neutral reason."

¶ 19       This case was then returned to this court pursuant to our retained jurisdiction.

¶ 20                                ANALYSIS

¶ 21       Although respondent raises several claimed errors on appeal, we need address only one: whether the State's proffered reason for using a peremptory against Connie T. was pretextual. The proponent of a *Batson* challenge always bears the burden of persuasion. *Rice v. Collins*, 546 U.S. 333, 338-39 (2006). We find that respondent has sustained his burden as to Connie T. and, therefore, reverse and remand for a new trial.

¶ 22       As noted in our original opinion, *Batson* is premised on the proposition that "the [e]qual [p]rotection [c]lause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." *Batson*, 476 U.S. at 89. If any member of the venire was dismissed based on race, respondent is entitled to a new trial. *People v. Davis*, 231 Ill. 2d 349, 360 (2008). Further, because the State's reason for exercising a peremptory against Connie T. rests on the State's representation, made for the first time on remand, that it did not believe her when she initially failed to recall her theft case, that subjective observation is subject to close scrutiny. *People v. Williams*, 209 Ill. 2d 227, 245 (2004) (citing *People v. Wiley*, 165 Ill. 2d 259, 274-75 (1995) (subjective assessments of a venireperson's demeanor should be given close scrutiny because such perceptions may be easily used as a pretext for discrimination)).

¶ 23       The trial court's third-stage findings regarding purposeful discrimination will not be reversed unless they are clearly erroneous. *Hernandez v. New York*, 500 U.S. 352, 365-69 (1991); *People v. Hogan*, 389 Ill. App. 3d 91, 100 (2009). A finding is clearly erroneous when a review of the record leaves a reviewing court with the definite and firm conviction that a mistake has been made. *People v. Payne*, 2015 IL App (2d) 120856, ¶ 43.

¶ 24       The trial court, in fact, assessed Connie T.'s demeanor when it denied the State's request to strike her for cause. Finding cause lacking, the court characterized her lack of recall of a nearly 40-year-old theft case as an "honest mistake" and commented that that it would not have expected her to remember such a minor matter in her distant past. Indeed, the court expressly found that Connie T. had not lied when she initially did not recall the 1977 case. Had the State, in fact, believed that Connie T. was, as it now contends, "lying" about her recall, we would have expected the State to take issue with the court's assessment of her demeanor and its refusal to dismiss her. But the State said nothing and instead exercised a peremptory.

¶ 25       Conversely, with respect to Joe W., the State claimed on remand that it found believable his failure to recall his 13-year-old DUI conviction until he was reminded of it in chambers. The State elaborates that Joe W. was credible and "likeable" when he explained that he

equated criminal matters with "boom, boom" and not with his DUI. Yet, notwithstanding the State's current position that it believed Joe W. genuinely overlooked his criminal case, the State still moved to strike Joe W. for cause, even after hearing his explanation. If the State genuinely believed Joe W. did not remember his DUI conviction and, therefore, did not deliberately fail to disclose it, the rationale for striking him for cause disappears. On the other hand, if nondisclosure, *per se*, was the determining factor, then the State should have used a peremptory against Joe W., just as it did for Bill B., who was dismissed for cause for failing to disclose a DUI, no questions asked.

¶ 26    At the time the State failed to exercise a peremptory against Joe W., it had three peremptories left. Joe W. became the eleventh juror. Thus, it is apparent that at that late stage in jury selection, the State could have used a peremptory against Joe W. without risking its later inability to strike an unacceptable juror. This case is thus unlike *Payne*, where the court found that the State's use of peremptories against certain members of the venire who had criminal records and not others was understandable given that later in the jury selection process, the State had only two peremptories left and prosecutors were concerned that striking a member of the venire with a criminal record who otherwise answered questions appropriately could lead to the inability to strike another member about whom the State had serious concerns. *Payne*, 2015 IL App (2d) 120856, ¶ 49. The State articulated no such strategy here.

¶ 27    And as we pointed out in our earlier opinion, by this point respondent had raised his *Batson* claim, and the State was undoubtedly aware that its use of another peremptory against a black member of the venire would prompt a renewed challenge. *In re A.S.*, 2016 IL App (1st) 161259, ¶ 41. Under these circumstances, it is difficult to give much credence to the State's fundamentally subjective reasons for dismissing Connie T. while keeping Joe W.

¶ 28    More problematic is the failure of the trial court to reconcile its earlier findings with its acceptance on remand of the State's newly articulated reason for striking Connie T. During the first hearing, the court readily found Connie T. believable and specifically determined that she was not lying. During the in-chambers questioning, the court had the same opportunity to observe Connie T.'s demeanor as did the State. When, on remand, the State asserted that contrary to the court's conclusions, it believed Connie T. was lying, it was incumbent on the court to evaluate the sincerity of this race-neutral explanation. Yet the court never probed the State's asserted belief by, for example, asking the State to articulate precisely what it was about Connie T.'s demeanor that led to the conclusion that she was lying or asking the prosecutor why, if she had concluded Connie T. was lying, she did not press her request to dismiss her for cause. And the State's characterization of the exchange during chambers questioning is demonstrably incorrect; the court did the questioning, and Connie T. was not "confronted" or "pressed" by the State about anything.

¶ 29    The transcript on remand does not reveal that the court undertook "a sincere and reasoned attempt to evaluate the prosecutor's explanations in light of the circumstances of the case." (Internal quotation marks omitted.) *People v. Harris*, 129 Ill. 2d 123, 174-75 (1989). During the third stage of a *Batson* hearing, a trial court is often called upon to assess the credibility of the lawyers exercising peremptory challenges. *Hernandez*, 500 U.S. at 365; *Rivera*, 221 Ill. 2d at 502 ("[A] trial court's third stage finding on the ultimate issue of discrimination rests largely on credibility determinations." (Emphasis omitted.)). Typically, such observations and credibility findings are entitled to deference and will not be reversed unless

they are clearly erroneous. *Hernandez*, 500 U.S. at 365-69. But, here, the trial judge's observation about not seeing any sign of discrimination by the lawyers in his courtroom, to which we defer, is of marginal relevance given that, under *Batson*, the issue is not racial animus but the respondent's right to a fair trial, including a jury selection process untainted by improper exclusion of prospective jurors based on race. The State, like any other party to a jury trial, wants to seat a jury that will be favorable (or at least not hostile) to its case. *Batson* focuses on the *reason* the State believes a particular juror should not be seated, and if the juror's race is the reason, a violation exists despite the fact that the prosecutor does not otherwise discriminate against or harbor any animus toward that race. Further, other than the court's repetition of the State's reasons for striking Connie T. and retaining Joe W., *i.e.*, that the State believed one and disbelieved the other, the court made no finding that the State's assessment of Connie T.'s and Joe W.'s truthfulness was sincere. And given the significant indications we have discussed above that the State's subjective reason for striking Connie T. was, in fact, pretextual, we conclude respondent has sustained his burden to show a *Batson* violation and is, consequently, entitled to a new trial.

¶ 30        Reversed and remanded.

¶ 31        JUSTICE NEVILLE, specially concurring.

¶ 32        I concur with the judgment reached by the majority but I write separately to suggest rules to make it easier for courts to review *Batson* violations. In *Powers v. Ohio*, 499 U.S. 400 (1991), Justice Kennedy made the following statement:

> "[R]acial discrimination in the selection of jurors 'casts doubt on the integrity of the judicial process,' *Rose v. Mitchell*, 443 U. S. 545, 556 (1979), and places the fairness of a criminal proceeding in doubt.
>
> *** Active discrimination by a prosecutor during this process condones violations of the United States Constitution within the very institution entrusted with its enforcement, and so invites cynicism respecting the jury's neutrality and its obligation to adhere to the law. The cynicism may be aggravated if race is implicated in the trial, either in a direct way as with an alleged racial motivation of the defendant or a victim, or in some more subtle manner as by casting doubt upon the credibility or dignity of a witness, or even upon the standing or due regard of an attorney who appears in the cause.
>
> ***
>
> The purpose of the jury system is to impress upon the criminal defendant and the community as a whole that a verdict of conviction or acquittal is given in accordance with the law by persons who are fair. The verdict will not be accepted or understood in these terms if the jury is chosen by unlawful means at the outset. ***
>
> * * *
>
> The Fourteenth Amendment's mandate that race discrimination be eliminated from all official acts and proceedings of the State is most compelling in the judicial system. [Citation.] We have held, for example, that prosecutorial discretion cannot be exercised on the basis of race, [citation], and that, where racial bias is likely to influence a jury, an inquiry must be made into such bias. [Citations.] The statutory

prohibition on discrimination in the selection of jurors, 18 U.S.C. § 243, enacted pursuant to the Fourteenth Amendment's Enabling Clause, makes race neutrality in jury selection a visible, and inevitable, measure of the judicial system's own commitment to the commands of the Constitution. The courts are under an affirmative duty to enforce the strong statutory and constitutional policies embodied in that prohibition. [Citations.]

\*\*\*

It remains for the trial courts to develop rules, without unnecessary disruption of the jury selection process, to permit legitimate and well-founded objections to the use of peremptory challenges as a mask for race prejudice." *Powers*, 499 U.S. at 411-16.

¶ 33    Racial discrimination in jury selection persists after *Batson*. See David C. Baldus *et al.*, *Statistical Proof of Racial Discrimination in the Use of Peremptory Challenges: The Impact and Promise of the* Miller-El *Line of Cases as Reflected in the Experience of One Philadelphia Capital Case*, 97 Iowa L. Rev. 1425, 1464-65 (2012). Several courts have found direct evidence that prosecutors explicitly excluded black persons from juries because of their race. See *Foster v. Chatman*, 578 U.S. ___, ___, ___, 136 S. Ct. 1737, 1744, 1755 (2016); *Commonwealth v. Basemore*, 744 A.2d 717, 729-31 (Pa. 2000).

¶ 34    Courts have permitted and encouraged the continuing discrimination by imposing on defendants the burden of creating a record showing the racial identities of the venire, and the burden of proving that a facially neutral reason for excluding a juror actually arose from racial discrimination. Courts have not infrequently found *Batson* issues waived by the defendant's failure to make a sufficient record. See *United States v. Collins*, 195 F. App'x 419, 422 (6th Cir. 2006); *States v. State*, 88 So. 3d 749, 755 (Miss. 2012); *Hatchett v. State*, 930 S.W.2d 844, 847 (Tex. App. 1996).

¶ 35    As one commentator noted, "Unfortunately, *Batson* did not become the cure many had hoped for, and parties determined to exclude jurors on the basis of race developed pretextually 'race-neutral' means to do so without violating *Batson*. Much of the *Batson* jurisprudence from the late 1980s and 1990s consists of a torrent of decisions restricting the application of *Batson*, finding *Batson* challenges to have been waived, or finding *Batson* challenges to have been without merit under the restrictive applications of *Batson* established by the circuit courts." Mikal C. Watts & Emily C. Jeffcott, *A Primer on* Batson, *Including Discussion of* Johnson v. California, Miller-El v. Dretke, Rice v. Collins, & Snyder v. Louisiana, 42 St. Mary's L.J. 337, 341-42 (2011).

¶ 36    If courts are to meet their "affirmative duty to enforce the strong statutory and constitutional policies embodied in" the fourteenth amendment as interpreted in *Batson*, (*Powers*, 499 U.S. at 416), courts need to take a more active role in protecting the rights of defendants to a fair jury.

¶ 37    Following the Supreme Court's imprecation that the courts must develop rules to help implement *Batson*, and to assist in the review of *Batson* claims, circuit court judges in both civil and criminal cases should be directed, once a *Batson* claim is made, to make all juror summonses a part of the record and circuit judges should be directed to write on each summons the race and gender, etc., of each juror to assist the reviewing court with *Batson* challenges. The circuit court should hold a hearing that involves three stages:

A. The court should direct the defendant to make out his *prima facie* case of racial discrimination in the State's exercise of its peremptory challenges.

B. If the defendant makes a *prima facie* case for racial discrimination, the court should require the State to come forward with a neutral explanation for challenging each juror.

C. If the State offers an acceptable neutral explanation for its peremptory challenges, the court should give the defendant a chance to show that the State's neutral explanation is pretextual. See *People v. Harris*, 129 Ill. 2d 123, 174-75 (1989).

¶ 38 But the court should also go further, to help uncover racial discrimination in jury selection. The court should maintain a database that includes the information from the juror summonses. The database should show the demographic composition of venires for all jury trials in civil and criminal cases, and it should record how each prosecutor (and plaintiff's attorney) and each defense attorney exercised his or her peremptory challenges. See Catherine M. Grosso & Barbara O'Brien, *A Stubborn Legacy: The Overwhelming Importance of Race in Jury Selection in 173 Post-*Batson *North Carolina Capital Trials*, 97 Iowa L. Rev. 1531, 1544-47 (2012) (concerning the need for, and difficulty of collecting, accurate data regarding the race of venire members). The court should make the data available to any attorney who needs the data to show that an assistant State's Attorney (plaintiff's attorney), a State's Attorney's office (plaintiff's attorney's office), a defense attorney, or a defense attorney's office has, in the past, systematically used peremptory challenges in a racially discriminatory manner.

¶ 39 Attorneys seeking to raise *Batson* issues should also make a record specifically identifying:

A. the race or gender of all the venirepersons in the jury pools,

B. the race or gender of all venirepersons remaining after challenges for cause,

C. the race or gender of those removed by the plaintiff's attorney, and

D. the race or gender of the jurors who served and the gender of jurors acceptable by the plaintiff's attorney who were stricken by the defendant's attorney.

¶ 40 Attorneys who violate *Batson* should receive additional training or should be required to take a continuing legal education course to ensure that a *Batson* violation does not occur in the future.

¶ 41 Finally, the court should adopt rules, like the rules suggested here, to protect the rights of all parties, in both civil and criminal cases, to a fair trial by a qualified and impartial "jury free from ethnic, racial, or political prejudice, [citations], or predisposition about the defendant's culpability." *Gomez v. United States*, 490 U.S. 858, 873 (1989).